# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE

## FILED

November 2, 1999

Cecil Crowson, Jr.
Appellate Court Clerk

| | | |
|---|---|---|
| RICHARD THOMAS BOGAN, | ) | |
| | ) | NO. 03A01-9811-CH-00393 |
| Plaintiff/Appellee | ) | |
| | ) | |
| vs. | ) | Appeal as of Right From The |
| | ) | SULLIVAN CO. CHANCERY COURT |
| DORIS MAE BOGAN, | ) | |
| | ) | HON. JOHN S. McLELLAN, III |
| Defendant/Appellant. | ) | CHANCELLOR |

**For the Appellant:**
Stephenson Todd
Todd & Dossett, P.C.
134 W. Center Street
Kingsport, TN 37660

**For the Appellee:**
Carl W. Eilers
111 East Market Street
Kingsport, TN 37660

Thomas F. Bloom
500 Church St. 5th Fl.
Nashville, TN 37219

REVERSED AND REMANDED                              Swiney, J.

## OPINION

This is an appeal by Ms. Bogan (Appellant) from an Order of the Chancery Court for Sullivan County which

reduced Mr. Bogan's (Appellee) alimony payments to her from $2,300 monthly to $945 monthly after Appellee's retirement.

On appeal, Appellant raises the issue of whether the Chancellor erred in finding that there had been a substantial and material change of circumstances under the provisions of T.C.A. § 36-5-101(a)(1), Appellee's retirement, which justified a reduction of the periodic alimony awarded her at the time of her divorce. Appellee contends that his retirement was not foreseeable at the time of their 1991 divorce, was not contemplated by the divorce decree, was not voluntary, and was a substantial and material change of circumstances sufficient to justify a reduction in alimony. Appellant also argues that this Court "should adopt the approach used by most other jurisdictions in which a good faith retirement, although foreseeable or voluntary, nevertheless gives the obligor the right to have his or her alimony obligation reassessed." Under the particular facts of this case, we find that Appellant's retirement was voluntary and foreseeable, and was in fact foreseen at the time of the divorce. We reverse the decision of the Trial Court and reinstate the prior award of $2300 monthly alimony provided in the parties' original divorce decree.

## BACKGROUND

Plaintiff [Appellee] was 62 years old on September 19, 1999, and Defendant [Appellant] is 60 years old. After 30 years of marriage, and upon Appellee's complaint for Divorce, Appellant was granted a divorce on July 24, 1991, upon the grounds of adultery. The Judgment of Absolute Divorce incorporated a property settlement agreement which apportioned the marital assets. The marital residence was sold and the equity realized was divided equally. Appellant received as her separate property all of the parties' one-half interest in Sheffield Studios, Inc., d/b/a/ The Shade Shop, and all real estate owned by that corporation, and assumed any liabilities owing and the mortgage on a vacant lot owned by the corporation. The amount existing in Husband's Kodak Retirement Income Plan (KRIP) as of the date of the divorce was equally divided between Appellee and Appellant. Accordingly, each party was entitled to $144,888 of the retirements rights, which were valued at the time at $289,776. Appellant was entitled to any pre-retirement survivor benefits, and could elect to receive post-retirement survivor benefit coverage at her cost. Appellee received as his separate property all of his Kodak Employee Stock Ownership Plan (KESOP). Appellant received 10% of the present value of Appellee's Savings and Investment Plan (SIP) (401[k]) as of the date of the divorce, payable in a lump sum, and Appellee received 90%. Each party received as their separate property their individual IRA accounts. Appellant's credit union savings accounts totaling $4,083.01 were divided equally, and the remaining personal property was divided as agreed. In addition to these property settlement provisions, Wife was awarded periodic alimony in the amount of $2,300 per month, until her remarriage or the death of either party.

Six years later, on August 25, 1997, Appellee filed a Motion to Terminate Alimony alleging two material changes in circumstances: (1) that he had reached retirement status with his employer and due to his retirement, he would no longer be earning wages through his employer, and (2) that because he would reach "pay status for his retirement," Appellant would "also reach pay status and will also receive retirements benefits [from her $144,888 share of the KRIP, which she received as part of the property settlement in the divorce decree]."

Appellant answered on December 4, 1997, denying that there had been a legally relevant material change in circumstances sufficient to terminate Appellee's alimony obligation. She averred that Appellee's retirement was voluntary, and that Appellee received total lump sum retirement distributions of $595,344 while she will receive approximately $144,888.[1]

A hearing on Appellee's Motion to Terminate Alimony was held on February 19, 1998. Appellee testified that, at the time of the divorce, alimony was set at $2,300 by agreement of the parties, and that "[r]etirement wasn't even on my mind at the time." Appellee testified he had never thought about retiring and had never discussed it with the Appellant. However, Appellee then testified on cross examination that he had expected to retire at age 60-62.

Appellee testified that, between 1991 and 1996, Eastman, his employer, underwent major changes which precipitated his decision to retire. At the time of the divorce, his gross wages as a Ph.D. chemist at Eastman were $6,908 per month, and at the time of his retirement, he was earning $8,375 per month. Although his salary was never reduced, he was transferred several times, and he ultimately held a job as an individual scientist who supervised one technician, whereas he had formerly held a management position and supervised up to 40 people. After his divorce, the company established a stated objective to reduce costs by 500 million dollars, largely through reduction in force. Goals were set by the company to achieve the cost reduction, and from late 1996 through 1997, employees who were eligible to retire began receiving e-mail encouraging them to attend seminars about the benefits of retirement. He was more than eligible to retire, since the company requires 85 "points" for retirement eligibility, and he had 90. Because of all of these changes, he felt that "[i]t's time to go." During this testimony, counsel for Appellant objected to Appellee's statements about the goals of the company, and the Court and the parties agreed that an expert witness from the employer company would be required, so the hearing was continued.

At the rescheduled April 22, 1998 hearing, and pursuant to Appellee's subpoena, George Devinney, Manager of Employee Benefits at Eastman Chemical Company, provided copies of information about retirement that the company had distributed to employees between January 1996 and September 1, 1997. He presented a large number of in-house newspaper

articles, copies of information on the company web site, and videos of presentations made at company-wide meetings about changes in the retirement policy. He then described Eastman's new benefit program, which took effect on January 1, 1998. Salaries earned after that date are subject to a retirement fund computation whereby, when the employee reaches 85 points in the retirement system, "the lump sum would start to decrease." Because Appellee had over 85 points when he retired, under the new system, his lump sum payout for salaries earned after January 1, 1998 would decrease the longer he stayed at Eastman. Also, for salaries earned after January 1, 1998, there is no survivor benefit. Moreover, January 1, 1998, was the last date one could retire and elect both a lump sum and get the survivor benefit, even as to retirement benefits on salary earned before that date. There were also decreases in life insurance availability after that date. On cross examination, Devinney testified that the spinoff of Eastman from Kodak took place January 1, 1994, and it was never the intent of the benefit strategy review committee to encourage people to retire prior to January 1, 1998. That was never mentioned as a goal in any management meetings he attended or stated in any literature he was involved in disseminating.

David Grice, First Vice-President of Smith-Barney brokerage firm in Asheville, North Carolina, then testified for Appellee that he is Appellee's "money manager" and handles his Eastman retirement fund. Appellee is currently receiving about $3,500 a month income from the investment of his lump sum retirement payout. Mr. Grice testified that "we set it up where we draw pretty much what the fund earns." The plan is designed so Appellee will not go through the principal. Appellee's counsel provided Grice with a list of assets Appellant received in the divorce, including $10,414 in cash, $8,200 in an IRA and $144,880 lump sum entitlement from Appellee's Eastman retirement (KRIP). With that list, Grice prepared a "cash flow analysis," based on the long-term rate of return of a hypothetical mixed portfolio of stocks and bonds. Grice opined that, assuming a 10% rate of return, and if Appellant used all of the principal during her lifetime, she would have an income of $16,283 per year [or $1,356.92 per month] until age 85, at which time she would be "out of money." In addition, Appellee will be entitled to approximately $1,200 per month in social security benefits at age 62 and Appellant will be entitled to $600 per month at age 62. Grice prepared another scenario, which he thinks is a little bit more realistic, using the same list of assets but assuming she would not diminish principal. Under that scenario, she would "take out $14,763 per year" [$1,230.35 per month] for the first 15 years, but as the principal increased, her income would increase.

On cross-examination, Grice testified that Appellee has approximately $600,000 invested with Smith-Barney, on which he is withdrawing approximately $3,500 per month, or seven percent. He anticipates the fund to earn ten percent over

time, but Appellee is withdrawing only seven percent so that his account value can keep up with inflation. On Appellant's analysis, he did not consider inflation. Mr. Grice had no real explanation why he used seven percent in his calculation for Appellee's income but used ten percent in his calculation as to Appellant's income. We agree with Mr. Grice's candid admission that "you can do anything you want to with the numbers."

Pamela Benzer, CPA and Certified Financial Planner with Gilbert, Carrier, Maurice and Benzer in Johnson City, testified for Appellant about five separate cash flow analyses her company prepared. She assumed Appellant's current income of $800 per month from her business until her hypothetical retirement at age 70, income of $2,300 per month alimony, social security at age 62, and income from $165,000 investment, consisting of proceeds of the divorce settlement (KRIP), IRA and cash. She assumed an annual rate of return of eight percent, and expenses as they currently exist, as provided by Appellant and her counsel. In this hypothetical, assuming alimony terminates "on the date of this hearing," she opined Appellant would "run out of money at age 69." Under another scenario, in which Appellant receives alimony until Appellee attains the age of 65 years, Appellant "will be able to make it through part of age 72." Under a third scenario, in which Appellant is able to reduce her annual living expenses by 25%, and if alimony stopped on the date of the hearing, Appellant would run out of money at age 72. Finally, if Appellant reduced her expenses by 25% and alimony ended when Husband attains the age of 65, Wife would deplete her assets at age 79. She testified that a ten percent rate of return might be accurate historically if you consider from 1926 to the present, based on 100 percent investment in large company US stocks, but she has never seen anybody [client] who could handle the volatility. Further, a retiree whose income is based solely on such an investment would have years in which their income would be minus ten percent. For that reason, her firm never assumes a rate of return higher than eight percent.

Appellee testified that he receives $3,150 in net proceeds of his retirement (KRIP) investment monthly. He has no other source of monthly or regular income. His lump sum retirement benefit was $429,000, which was combined with $164,000 in 401(k) funds and invested with Smith-Barney. He has remarried. His current wife is an Eastman employee with 29 plus years' service, who anticipates working full-time there for another decade or more, with a bi-weekly income OF $1,500.

On the subject of his decision to retire, he testified that, after his divorce, he attended meetings at Eastman and received pamphlets in the mail. Appellee learned about the loss of survivor benefit for anyone selecting lump sum distribution,

and that lump sum on future earnings was going to be eliminated. Based on that information, he determined that he would lose benefits if he remained employed after January 1, 1998. Despite the fact that the new plan at Eastman did not go into effect until January 1, 1998, Appellee retired on September 1, 1997, a few days short of 60 years old, with 88 or 89 retirement points accumulated, and with full benefits. It was his understanding that, if he had stayed longer, Appellant's portion of his lump sum benefit could in fact have decreased under the new system. His job at Eastman had plateaued and was probably in a downward direction, his job satisfaction was fairly low, and he was looking forward to leaving the company. He formed that mind set probably in late 1996, and before that time, his mind set was neutral.

On cross-examination, Appellee agreed that the following colloquy occurred when he was deposed by Appellant's counsel on November 14, 1997:

Q: Did you envision working at the time that you were divorced to the age of 65 and retiring, or when did you envision working?

A: No, I never envisioned working to 65.

Q: What age did you envision working to?

A: I fully expect to retire probably sometime between 60 and 62.

He also amplified this prior depositional testimony at trial:

Q: So what your mind -- what you told me what your mind was last November about the divorce time is different than what you recall your mind being today. Is that right?

A: I think it's always been in my mind that I would retire sometime between -- I think that's something between you and my ex-wife that came up with the 65 idea. And this business of magicness of 65 is something that I just don't understand. I mean, I was a retirement eligible person.

Q: So you had always envisioned that you would probably retire between 60 and 65?

A: 60 and 62 would be more like it.

Husband further testified at trial that the decision not to classify Wife's alimony as rehabilitative in the original divorce and the failure to address the issue of modification of alimony upon his retirement were mistakes on his part made on the day the divorce agreement was reached.

Paul Rhoton, CPA, testified that he is the accountant for Sheffield Studios, Inc., owned by Janice Comsa and Doris Bogan. He prepared the tax returns of the company for the years 1993 through 1997, and the only year the company actually

showed a profit was 1996. In that year, the actual net profit was $634. There was a capital gain from the sale of the Bloomer building in Kingsport, where her shop was located, and the $20,000 actually received in 1997 went to retire debt. Another $80,000 in capital gain from that sale was received by the company in 1998. Appellant had been holding six months of payroll checks to herself because of lack of company funds to pay them, and she paid herself for those checks. Then she received a one-half share of the capital gain, or $31,377. He described the two owners of the business as having to "struggle . . . put in a lot of time and effort . . . to stay in business."

Personal income tax returns of Appellant showed wages of $6,850 in 1994, wages of $9,600 in 1995, wages of $5,200 in 1996, wages of $5,750 in 1997, and alimony in each of those years of $27,600. Joint income tax return of Husband and his present wife for 1997, the last year he worked, showed wages of $152,514.

Appellant testified that, at the time of her divorce, she had been married to Appellee for two months short of 30 years, and that she had never worked outside the home until she and Janice Comsa went into business with The Shade Shop in 1983. Since the business opened, she had tried to draw $200 per week salary from the Shop but was not always able to cash the checks. At the time of the divorce, the business consisted of two shops, one in Kingsport and one in Bristol. In the divorce, she received the parties' one-half interest in the business, including the Bloomer building and a vacant lot on Jack White Drive in Kingsport. The Jack White property sold in 1993, and she used her proceeds to make the down payment on the condominium where she now lives. The Bloomer building sold in 1997, as previously described, and she used the proceeds received that year to pay off consumer debt incurred to meet her regular living expenses. She and Comsa opened a Shade Shop in Johnson City soon after her divorce; now she owns that shop individually, Comsa owns the Kingsport shop, and the Bristol shop is closed. She testified that she expects to have to work until age 70 because of her limited earning power. Her accountant has advised her to consider closing the shop, which has not been successful, but the only job she thinks she could get would be as a clerk in a department store.

Appellee submitted a Statement of Estimated Monthly Expenses indicating individual monthly itemized expenses of $2,867 plus $2,300 alimony paid to Appellant, for a total monthly budget of $5,167.51. He showed net monthly income from his retirement investment of $3,150, resulting in a net monthly loss of $2,017.51. His eligibility, as of September 19, 1999, for social security benefits of $1,200 per month, if included in the calculation of monthly income, would result in a net monthly loss of $817.

Appellant submitted a Statement of Estimated Monthly Expenses indicating individual monthly itemized expenses of $3,313, net monthly income from her business of $735, and net monthly alimony of $2,033, resulting in a net monthly loss of $545. She will not be eligible for social security benefits of $600 per month until she reaches age 62, on July 14, 2001.

The Trial Court, in a Memorandum Opinion and Order filed July 13, 1998, found that Appellee has experienced a substantial and material change in circumstances owing to his retirement which, although voluntary, was occasioned by the employer's retirement policy changes, which were unforeseeable. Having made the decision to retire by January 1, 1998, as required under the employer's new policy in order to retain full benefits, "Appellee cannot reverse the decision." Further, the Court found that Appellant's financial situation is somewhat improved because she now has the opportunity for a successful business enterprise, since she is sole owner of The Shade Shop in Johnson City.[2] The Court found that Appellant still needs alimony and Appellee still has an ability to pay, and ordered a decrease in alimony from $2,300 per month to $945 per month. The Court calculated this amount to be one-third of Appellee's current net monthly income, and ordered "said sum of alimony to be further subject to any additional income earned by the [Husband] in the future." Appellee was ordered to provide Appellant each year a complete and correct copy of his income tax reports, W-2's or other documents of income earned for such time as [his] obligation to pay periodic alimony continues.

## DISCUSSION

Our review is de novo upon the record, accompanied by a presumption of the correctness of the findings of fact of the trial court, unless the preponderance of the evidence is otherwise. Rule 13(d), T R A P.; *Lindsey v. Lindsey,* 976 S.W.2d 175, 178 (Tenn. App. 1997). We have addressed in detail the facts of this case because whether or not there was a substantial and material change in circumstances is entirely dependent upon the specific facts of this case.

Appellant contends that Appellee's retirement was foreseeable at the time of the 1991 divorce, was contemplated in the divorce judgment since a division of retirement benefits was incorporated in the order, and was voluntary. Appellant maintains that Appellee's retirement cannot be a substantial and material change in circumstances as contemplated by T.C.A. § 36-5-101(a)(1).

Appellee argues his retirement was not foreseeable, and that while he generally may have had some type of expectation or hope in 1991 that he would retire at the age of 60-62, there was no definitive plan to do so. Appellee argues that the evidence proves his retirement was neither foreseeable nor voluntary, but predicated on major changes in his job, the

company, and the retirement benefits policy.

Appellee acknowledges that the alimony provision in the divorce decree does not address whether a reduction would be made upon his later retirement. However, citing as persuasive the decision of a Pennsylvania court, he argues there is no requirement that a divorce decree anticipate and address every possible change of circumstances. *McFadden v. McFadden,* 563 A.2d 180, 183 (Pa.Super. 1989). He also cites cases in other jurisdictions which hold that "silence in a divorce decree about what will happen in the event of retirement should not preclude consideration of a reasonable retirement as part of the total circumstances in determining if sufficient changed circumstances exist to warrant a modification of alimony." *Pimm v. Pimm,* 601 So.2d 534 (Fla. 1992). Finally, Appellee argues that this Court should adopt the approach used by other jurisdictions in which a good faith retirement, although foreseeable or voluntary, nevertheless gives the obligor the right to have his or her alimony obligation reassessed. Appellee argues that the "strict foreseeability/voluntariness approach urged by Appellant" is obviously out of step with the modern trend in the law, and that only two jurisdictions, New York and North Dakota, appear to adhere to such an inflexible position on this issue.

T.C.A. § 36-5-101 provides that the court may order spousal support and, ". . . on application of either party for spousal support, the court may decree an increase or decrease of such allowance only upon a showing of a substantial and material change of circumstances." T.C.A. § 36-5-101(a)(1) (1996 & Supp. 1998). The party seeking relief on the grounds of a substantial and material change in circumstances has the burden of proving such changed circumstances warranting an increase or decrease in the amount of the alimony obligation. *Seal v. Seal,* 802 S.W.2d 617, 620 (Tenn. App. 1990). The change in circumstances must have occurred since the entry of the divorce decree ordering the payment of alimony. *Elliot v. Elliot,* 825 S.W.2d 87, 90 (Tenn. App. 1991). Furthermore, the change in circumstances relied upon must not have been foreseeable at the time the decree was entered. *Id.*

The decision to modify the alimony obligation is factually driven and requires a careful balancing of several factors. *Cranford v. Cranford,* 772 S.W.2d 48, 50 (Tenn. App. 1989). The factors set forth in T.C.A. § 36-5-101(d), applicable to the initial grant of spousal support and maintenance, where relevant, must be taken into consideration in determining whether there has been a change in circumstances to warrant a modification of the alimony obligation. *Threadgill v. Threadgill,* 740 S.W.2d 419, 422-23 (Tenn. App. 1987).

While T.C.A. § 36-5-101(d) enumerates several factors for the court to consider, the need of the spouse receiving

the support is the single most important factor. *Cranford,* 772 S.W.2d at 50. In addition to the need of the spouse receiving support, courts most often take into consideration the ability of the obligor spouse to provide support. *Id.*

This Court, in an Opinion filed January 27, 1999, has reaffirmed these long-held principles of Tennessee law in cases where the payor seeks to reduce or terminate periodic alimony. In the case of *Sannella v. Sannella,* No. 01A01-9701-CV-000004 (Tenn. Ct. App. Nashville January 27, 1999, perm. app. denied June 7, 1999), Husband petitioned to terminate his spousal support obligation following a twenty-year marriage by filing a petition shortly after his retirement, alleging decrease in his income and post-divorce increase in his former wife's income. The Sanellas, now both in their late 60s, were divorced in 1976; Wife was awarded the divorce based on cruel and inhuman treatment. Husband had a successful pathology practice and Wife did not work outside the home during the marriage, although she had a master of science degree. The trial court directed Husband to pay Wife $1,250 per month in long-term spousal support until her death or remarriage. Wife obtained a job after the divorce, at which she earned $6 per hour; she later obtained a position at Vanderbilt University School of Medicine, where, at the time of the alimony termination hearing, she earned approximately $38,000 per year. Husband remarried and moved to Utah, where he established a successful solo practice and co-owned an air ambulance service. He retired in 1994 because he was "tired," because the work had become difficult, and because he did not believe he was as sharp as he once had been. He then moved to Florida with his third wife, who earns $65,000 annually. They owned a $185,000 home with a pool and a $60,000 sailboat, as well as a condominium. Their joint income tax return for 1995 stated that their gross income was $222,349. The Trial Court denied Mr. Sanella's petition after concluding that his retirement did not affect his ability to pay spousal support and that his former wife continued to need support. This Court affirmed, reciting the familiar principles of law as stated above. Applying those principles to the facts, we found that:

> When the parties divorced [in 1976], Dr. Sanella's eventual retirement [in 1994] and Ms. Sannella's re-entry into the workforce were certainly foreseeable . . . At the time of trial, his net worth had increased to $750,000 . . . [a]lthough Dr. Sannella is now retired, he still earns $2,500 a month from his position with Med-Arrow, Inc and his social security benefits. During the first quarter of 1996, he paid himself only $3,500 from his professional corporation, even though the corporation's gross income for 1995 was $78,245 . . . .

> * * *

> Counting the support received from Dr. Sannella, Ms. Sannella receives $3,400 each month and has expenses of $3,543, creating a $134 monthly shortfall. Dr. Sannella's support payments constitute 36% of Ms. Sannella's income. She has managed to accumulate $296,000 in assets . . . . Ms. Sannella plans to work as long as she can, but she will only be

able to work until her seventieth birthday because of Vanderbilt's mandatory retirement policy.

* * *

Accordingly, we conclude that Dr. Sannella has failed to prove that the change in circumstances is material enough to justify terminating his spousal support obligation. His retirement from a lucrative medical practice, his purchase of a new home, and his remarriage were voluntary decisions that have not rendered him unable to continue to meet his support obligation. Under the facts of this case, Dr. Sannella has failed to provide justification for terminating Ms. Sannella's support.

In affirming the trial court, this Court considered its findings of foreseeability and voluntariness and acknowledged the statutory factors set forth in T.C.A. § 36-5-101(d), with the need of the spouse receiving the support as the single most important factor. *Cranford,* 772 S.W.2d at 50. Applying those same principles to the case at bar, we find that the Trial Court erred in decreasing Appellee's alimony obligation in this case. As in *Sanella,* Appellee's eventual retirement was certainly foreseeable at the time of the divorce. The proof shows the parties contemplated that eventuality since they divided retirement benefits as part of their property settlement. Despite the Appellee's initial testimony that retirement wasn't even on his mind at the time of the divorce, he admitted on cross-examination that he had never envisioned working to age 65. In fact, he testified that he had fully expected to retire somewhere between 60 and 62. Appellee retired a few short days before his sixtieth birthday even though he could have worked past his sixtieth birthday under the old benefit plan at Eastman. The evidence in the record before us is clear that Appellee made a voluntary determination that it was in his financial interest, as well as his personal interest, to take early retirement as he had fully expected to do all along.

Appellee receives a monthly payment from the investment of his KRIP retirement assets which is one-half the amount he formerly received in salary, and he stated that he is now eligible for an additional $1,158 in social security benefits. Appellant's monthly alimony payments are the primary source of her income. Her income disbursements from the distribution of her share of Appellee's KRIP account will not, by any testimony, exceed $1,450 per month. She will not be eligible for social security for several years, and then she will be limited to one-half of the amount Appellee receives.

We find the evidence preponderates against the Trial Court's finding that Appellee's retirement was unforeseeable. The record as a whole shows that Appellee's retirement was both voluntary and foreseeable, and in fact, was foreseen at the time of the divorce. The preponderance of the evidence is that Appellee's retirement was not a substantial and material change in circumstances as contemplated by T.C.A. § 36-5-101(a)(1). Appellee's decision to retire was predicated, at least in large

part, on his determination that it was in his financial interest to do so. Appellee admits that his failure to address, at the time of the divorce, the issue of modification of alimony upon retirement was a mistake on his part made on the day the divorce agreement was reached. Appellee's voluntary and foreseeable retirement should not result in Appellant's financial detriment. Accordingly, we reverse the decision of the Trial Court and reinstate the prior award of $2,300 monthly alimony as provided in the parties' original divorce decree.

We do not hold by this Opinion that retirement is always a foreseeable event so as to preclude later modification of periodic alimony due to a party's retirement. Our holding expressed in this Opinion is based upon the particular facts as evidenced in the record before us in this case. Whether a party's retirement is a substantial and material change of circumstances, as expressed earlier in this Opinion, is dependent on the facts of each case.

## CONCLUSION

The judgment of the Trial Court is reversed and this cause is remanded to the Trial Court for such further proceedings, if any, as may be required, consistent with this Opinion, and for collection of the costs below. The costs on appeal are assessed against the Appellee.

_____
D. MICHAEL SWINEY, J.

**CONCUR:**

_____
HOUSTON M. GODDARD, P.J.

Separate Dissenting Opinion

CHARLES D. SUSANO, JR., J.